Julius Jensen et al., Appellants, v. Booth Motor Company et al., Appellees.

No. 46456.

April 4, 1944.

White & White, of Harlan, for appellants.

Fred Louis, Jr. and Bennett Cullison, both of Harlan, for appellees.

OLIVER, J.— Appellant Julius Jensen is a son-in-law of Pete Hulsebus. Appellee motor company secured judgment against Hulsebus in March 1941. In 1943, execution thereunder was levied upon a certain farm and the livestock, machinery, grain, and other property thereon. Originally, this was an action brought by Jensen, who held title to the farm, and Cless R. Kibby, who had contracted to buy the farm and had bought part of the personal property thereon, to enjoin the sale of the real estate under said execution. The issues involved in that part of the action are not involved in this appeal.

The phase of the controversy now under consideration had its inception in a counterclaim, filed by appellee, alleging that the farm and the personal property thereon and the proceeds from the sale thereof were the property of Hulsebus, taken and held in the name of Jensen to hinder, delay, and defraud the creditors of Hulsebus, and praying that Jensen and Kibby be required to account for the property and credits of Hulsebus held by them and for judgment therefor. Appellee pleaded, also, that the action was brought under section 11815, Code of Iowa, 1939, which provides for actions in equity by a judgment creditor against persons indebted to the judgment debtor or holding property or money in which the debtor has any interest, to subject the same or the interest of the debtor therein to the satisfaction of the judgment.

June 17, 1943, appellee filed an amendment to its counterclaim, designated count 2, alleging Jensen and Hulsebus had conducted a joint adventure or copartnership which had been terminated by sale and that the interest of Hulsebus in the proceeds, which were held by Jensen, exceeded appellee's judgment. Appellee prayed judgment against Jensen in the amount of its judgment against Hulsebus.

Trial to the court resulted in judgment against Jensen in said amount, and this appeal. Although Kibby is designated as an appellant, he appears to be merely a nominal party to the

appeal. It is undisputed that Hulsebus was involved financially and had no other money or property from which collection could be enforced by his creditors and that Jensen knew this.

I. The alleged joint adventure of Jensen and Hulsebus was in the ownership and operation of the farm. The record contains a detailed accounting of the farming operations and shows they yielded such net profits that, if Hulsebus was entitled to share therein, such share would substantially exceed appellee's judgment. Counsel for appellants do not question this. In oral argument counsel for appellee suggested that, in view of the amount of the profits from the farming operations, held by Jensen, they were willing to rely solely upon the interest of Hulsebus therein without taking into account the profit from the sale of the real estate. Hence, the issue may be narrowed to the question whether Hulsebus was a joint adventurer in the farming operations.

Appellants conceded there was an agreement between Jensen and Hulsebus relative to their operation of the farm as a joint adventure. Their position is that the joint enterprise was prospective, contingent, conditional, "and never reached the stage of reality, but that all hope and thought of any joint business or enterprise by and between the said Julius Jensen and Pete Hulsebus was early abandoned * * *."

They contend that Hulsebus had merely an option to join in the enterprise and that the option was never exercised. Jensen testified:

"I say that he [Hulsebus] was to have a half interest when he put in some money."

The agreement between Jensen and Hulsebus concerning the operation of the farm was made shortly after the purchase of the farm in October 1941. Operations, under the agreement, started in February 1942. Hulsebus and Jensen called upon John Schram and hired him to work on the farm at $60 per month. Hulsebus testified:

"Julius and I hired John Schram to work for us."

At the same time the parties started buying machinery,

equipment, horses, livestock, etc., for the farming enterprise. Jensen handled the financing. He testified:

"I didn't put my own money into buying of the personal property. I would go to the bank and borrow money as I needed it and put the money into the account of Hulsebus & Jensen. * * * and kept [that deal] separate, my own private deal."

Both parties made checks on the Hulsebus & Jensen account. By May 18, 1942, practically all the stock and equipment had been purchased. The indebtedness to the bank then was $2,250. To secure this, Jensen gave the bank a chattel mortgage, in his own name, covering the personal property upon the farm.

Most of the machinery, livestock, and equipment was bought by Hulsebus. Payments were made by checks drawn by Hulsebus on the Hulsebus & Jensen account. Hulsebus testified he was not working for wages. He testified, also:

"I made numerous trips [alone] to Dow City, Denison and Wall Lake and Anita and places like that [in order] to buy stuff to use on that farm * * *. I paid for all of that expense out of my own pocket including expense for eating and stuff like that when I was traveling around, never drew a cent of it back."

On various occasions Hulsebus went to the farm and talked with Schram about its operation. Schram's salary was usually paid by Hulsebus with checks drawn by the latter on the Hulsebus & Jensen account. Hulsebus testified:

"Jensen arranged the finances and I managed the business, part of it. I have never drawn anything out of this business for myself."

Various items of livestock and crops produced on the farm were sold during the summer and fall of 1942. The proceeds from sales were placed in the Hulsebus & Jensen account, and were sufficient to pay current operating expenses and reduce the bank loan secured by the chattel mortgage which Jensen had executed.

Jensen testified it was never his intention that Hulsebus put in the money before the business was started but that he expected Hulsebus to do that in March or April 1942. In the

meantime, the enterprise was operating upon the money borrowed by Jensen. Presumably, Hulsebus owed a sum equal to half this amount. Jensen testified he "went along together" with Hulsebus all summer and until December when Jensen wanted to sell out "the deal" and Hulsebus wanted to "keep dragging along."

The operation of the farm by Jensen and Hulsebus continued without interruption or change until about December 31, 1942, at which time the farm and much of the personal property thereon were sold to Kibby. Jensen and Hulsebus went together to figure out the deal with Kibby. That deal, in effect, terminated the enterprise. Nothing was done thereafter except to dispose of the remainder of the machinery, crops, etc. This was done by Jensen. The net profit of the farming venture was four or five thousand dollars. Jensen holds this.

. The decree states:

"The contribution of Jensen to the venture was in the nature of a loan of credit except for a few items of property which was contributed in kind. The obligation representing the contribution was shortly thereafter secured by a mortgage on the property. The venture was successful from the beginning and it does not appear that the plaintiff at any time demanded a contribution from his coadventurer but that on the contrary they continued in the business, the plaintiff devoting a smaller part of his efforts to the venture than his coadventurer and it further appears that there was no need of any further capital thereafter for the purpose of the venture. * * * The circumstances surrounding the transaction do not support the claim of the plaintiff that the venture was executory or subject to any condition respecting a contribution of capital but that if any such condition did exist, it has long since been waived by the plaintiff."

Factual findings of a court of equity, involving the credibility of witnesses appearing before it, are entitled to substantial weight upon appeal. A consideration of the record, under this rule, leads to the conclusion that, from its inception to its termination, Jensen and Hulsebus conducted the farming venture as a joint enterprise and that half of the net profits

were the property of Hulsebus. See Southern White-Lead Co. v. Haas, 73 Iowa 399, 35 N. W. 494.

II. Reference has been made to an amendment to the counterclaim designated as count 2. This was filed after submission but before decision of the case. Before filing answer thereto, appellant moved that the amendment be stricken for that it was filed too late and changed the issues. The motion to strike was overruled June 23, 1943. Appellants predicate error thereon.

Prior to the amendment the counterclaim asserted all the personal property on the farm and the proceeds of the sale thereof belonged to Hulsebus and prayed that appellants be required to account therefor. The counterclaim also pointed out that the action was brought under Code section 11815, which provides for the subjection to the judgment of assets held by others which belong to the debtor, or the interest of the debtor therein.

Appellants pleaded Hulsebus had no interest in the assets held by Jensen. Jensen was the first witness called by appellee. His testimony disclosed the joint enterprise. That matter then became the focal point of the case. The purpose of the subsequent amendment was to make the pleadings conform to the proof. It was limited to matters which had been fully litigated at the trial.

Appellee was compelled to make its case largely by the testimony of hostile witnesses. Appellants knew what this testimony would be. Apparently, it surprised appellee. The circumstances warranted liberality in granting appellee permission to amend its pleadings and the order refusing to strike the amendment was not an abuse of the discretion lodged in the trial court in such matters.—Affirmed.

All JUSTICES concur.